2024 IL App (2d) 230103-U
No. 2-23-0103
Order filed June 20, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 19-CF-1056 |
| MARK RIVERA, | ) ) ) | Honorable John A. Barsanti, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices Schostok and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) The State proved beyond a reasonable doubt that defendant committed the charged sex offenses against the victim, and convictions for predatory criminal sexual assault and aggravated criminal sexual abuse do not violate the proportionate penalties clause.

¶ 2    After a bench trial, defendant, Mark Rivera, was convicted of two counts of predatory criminal sexual assault of a child, a Class X felony (720 ILCS 5/11-1.40(a)(1), (b)(1) (West 2018)) with a sentencing range of 6 to 60 years' imprisonment (*id.* § 11-1.40(b)(1)), and one count of aggravated criminal sexual abuse, a Class 2 felony (*id.* § 11-1.60(c)(1)(i), (g)) with a sentencing range of 3 to 7 years' imprisonment (730 ILCS 5/5-4.5-35(a) (West 2018)). He was sentenced to

six years' imprisonment for each conviction of predatory criminal sexual assault of a child and three years for aggravated criminal sexual abuse, all sentences to run consecutively. On appeal, defendant contends that (1) he was not proved guilty beyond a reasonable doubt and (2) his sentences for predatory criminal sexual assault of a child must be vacated and the matter remanded for Class 2 felony resentencing because that offense, as charged, was based on the same elements as aggravated criminal sexual abuse yet had carried a more severe penalty, thus violating the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      The State indicted defendant on 10 charges, all based on events occurring between June 9, 2018, and May 21, 2019, and involving E.M. Counts I through III alleged predatory criminal sexual assault of a child, and counts IV through X alleged aggravated criminal sexual abuse. Each count alleged that defendant committed the act for his sexual gratification and that, at the time, he was at least 17 years of age and E.M. was under 13 years of age. Counts I through III alleged that defendant knowingly made "contact" between "a part of [his] body" and E.M.'s "sex organ." Counts IV, V, VI, and IX alleged that defendant knowingly "touched the vagina of E.M." Counts VII and VIII alleged that defendant knowingly touched E.M.'s breasts. Count X alleged that defendant knowingly "pressed his penis against the body of E.M." The counts provided no differentiating detail aside from identifying the body parts involved.

¶ 5      At trial, E.M. testified as follows. She was born on June 9, 2009, and resided with her mother, Cherin L., her stepfather, James L., and her younger brothers, A.M. and B.L. She had known defendant and his family all her life; spent much time with them at her home and theirs; was close to defendant's daughter, A.R., who was around her age; and knew his older children,

L.R., M.R, and D.R. E.M. identified photographs of her home's living room and defendant's home's living room, kitchen, and basement. The photographs were admitted into evidence.

¶ 6     E.M. testified to three separate incidents in which defendant touched her inappropriately. She could not recall how old she was or what grade she was in at the time of the first incident. It happened in defendant's living room. Defendant and D.R. were sitting at a table playing "Settlers," a board game. A.R. was present. While E.M. sat on defendant's lap, he reached under the table, put his hand inside her underwear, and rubbed her vagina. E.M. felt a "bump under where [she] was sitting" but did not know what it was.

¶ 7     E.M. described another incident, which occurred when she was nine. She was in the kitchen of defendant's home with A.M., A.R., and D.R. She did not know if defendant's other children were there. Defendant asked her to come downstairs with him to the "man cave." Just the two of them went downstairs. When she and defendant went inside the man cave, they were alone. At defendant's request, E.M sat on defendant's lap. Defendant placed his hand under her clothes and rubbed her chest and vagina. He stopped when James opened the door to the man cave.

¶ 8     E.M. testified about another incident when she was nine years old. Cherin was pregnant with B.L. Defendant and his children visited E.M.'s family and watched a Bears game in the living room. There was a couch between two chairs. Cherin sat in the rocking chair, and defendant sat in the other chair with E.M. on his lap. All four of defendant's children were sitting on the couch. Defendant placed his hand under E.M.'s clothes and rubbed her breasts and vagina. He stopped when A.R. asked E.M to play outside. E.M. got up and left.

¶ 9     E.M. testified on cross-examination as follows. Defendant's children were homeschooled and were generally home when E.M. and A.M. visited. The basement included the man cave and

bedrooms for L.R. and M.R., the oldest children. The living room had a loft where A.R. and D.R. had bunk beds.

¶ 10    E.M. testified that, in 2018 and 2019, she often sat on defendant's lap. She recalled that on "the day *** that something bad happened to [her]" in defendant's living room, defendant and D.R. were playing Settlers, and A.R. was lying on the floor doing a puzzle. A.M. might have been there. Defendant's wife, Melissa, was in the kitchen, where she could see part of the living room. E.M. did not recall whether either L.R. or M.R. was home that day. When defendant touched her vagina that day, he did not remove or unbutton her pants or remove her underwear. He did not touch her breasts.

¶ 11    E.M. did not recall whether M.R. was in his room during the man cave incident. She did not believe that L.R. was home. Defendant did not speak while he touched E.M. and did not tell her to keep the incident a secret. The man cave was well-lit.

¶ 12    E.M. testified that it was light outside during the Bears game. She and the other children were in and out of the room numerous times. James, L.R., and M.R. sat on the couch, as did the other children when they were watching the game. Cherin was also in the room. When E.M. sat on defendant's lap, they were not covered by a blanket. He touched her vagina without pulling down her pants or underwear.

¶ 13    On redirect and recross examinations, E.M. testified that Melissa was in the kitchen when defendant touched her during the Settlers game. Melissa sometimes walked from the kitchen through the living room to her and defendant's bedroom.

¶ 14    James testified as follows. He met defendant and his family through their church and, until May 2019, saw him once or twice weekly. Defendant and his family often visited on Sundays or weekdays to watch recorded Bears games. James was generally absent during the weekday visits.

¶ 15    James testified that, in 2019, he sometimes dropped off E.M. at defendant's house and picked her up later. On February 2, 2019, he went to pick up E.M. and A.M. He saw that D.R., A.R., and A.M. were in the living room, but E.M. was not. James went looking for her. Eventually, he opened the door to the man cave. Defendant was sitting on a chair with E.M. on his lap. Nobody else was there. James told E.M. to get out and join the other children. James testified that Cherin had previously asked defendant to " [']model better boundaries for [E.M.]['] " After E.M. left the man cave, James asked defendant, " ['][H]ow is this modeling better boundaries having her down here alone with you?['] "

¶ 16    On cross-examination, James testified that, on February 2, 2019, the door to the man cave was not locked. The room was well-lit. After James entered, E.M. said nothing that concerned him. During the football viewings, James, L.R., and M.R. usually sat on the couch and Cherin sat in the chair on the other side of the couch from defendant. The small children went in and out of the living room, and the other people would get up for food or to go to the bathroom. James saw E.M. sit on defendant's lap sometimes, but they were never covered by a blanket. Nothing obstructed James's view of E.M.'s body. He never saw defendant's hands in E.M.'s pants or inside the front of her shirt, although he scratched her back under her shirt.

¶ 17    F.F. testified as follows. L.R. was her best friend. In November or December 2016, they attended a movie with F.F.'s brother, defendant, and M.R. Defendant was on F.F.'s left in the darkened theater. At one point, F.F. was holding a bowl of popcorn to pass around. Defendant put his hand between her legs and moved it slowly and firmly up over her clothes. She crossed her legs. Defendant withdrew his hand and mumbled something about the popcorn bowl.

¶ 18    Cherin testified as follows. In 2018 and 2019, she saw defendant every week at church on Sunday and frequently during the week. Cherin had had no reason to distrust defendant when she

dropped off her children at his home. E.M. often sat on defendant's lap. Cherin and defendant were usually the only adults present during the football games. In February 2019, when she was pregnant, Cherin often napped during the games.

¶ 19    Cherin testified that, on May 17, 2019, she drove to defendant's home to pick up E.M. and A.M. When they got home, E.M. told Cherin that defendant had been touching her that night. Cherin asked where; E.M. responded, " [']on my vagina,['] " and put her hand over that area. E.M. said that it had happened previously. The next day, E.M. told Cherin that similar things had happened at E.M.'s home and in the man cave at defendant's home. Based on what E.M told her, Cherin took E.M. to the Kane County Child Advocacy Center (Center).

¶ 20    Cherin testified on cross-examination that E.M. and A.R. often sat on defendant's lap. Defendant's children were usually home when Cherin's children visited. L.R.'s and M.R.'s basement bedrooms had curtains for doors and walls that did not go to the ceiling, and M.R.'s bedroom was five feet from the man cave. The living room was small, and people could mostly see what others were doing. There was a doorway between the kitchen and the living room, but there was no door, curtain, or other type of barrier in the doorway. Both rooms were a short walk from the parents' bedroom.

¶ 21    Cherin testified that she never saw defendant's hands in E.M.'s pants or inside the front of her shirt. When watching football, A.R. and E.M each spent some time sitting on his lap. Cherin could not recall whether E.M. and defendant were ever covered by a blanket.

¶ 22    Beth Mullarkey, an investigator with the Center, testified that, on May 21, 2019, she interviewed E.M. A video recording and transcript of the interview were admitted into evidence. E.M. looked at anatomical diagrams and pointed to where defendant had touched her.

¶ 23    E.M. told Mullarkey that the first incident occurred at her home when she was nine. While she sat on defendant's lap as they watched the football game, he put his hand on her breasts under her shirt. He also put his hand down the front of her underwear and "rub[bed] and then like g[ot] in between everything." E.M did not know whether anyone saw what he was doing. They were not covered by a blanket. The touching lasted until A.R. called E.M. outside to play.

¶ 24    E.M. told Mullarkey that another incident occurred in defendant's man cave while the other younger children played outside. It lasted about 20 minutes. E.M. told Mullarkey: "[Defendant] was just rubbing me all over like my shirt, and he was putting his hand under my underwear lots of times. *** [Defendant's hand was] rubbing and getting in between my thing." A third incident occurred while defendant was playing Settlers at his living room table with L.R., D.R., A.R., and A.M. present. E.M. was sitting on defendant's lap. He put his hand under her underwear and "like rubbed." E.M. did not believe anyone saw it, "[b]ecause it was under the table." Afterward, E.M. told Cherin what had happened. Until she spoke with Mullarkey, E.M. had not told anybody else about the incident.

¶ 25    The State rested.

¶ 26    M.R. testified for the defense that he was born on July 21, 2002, and lived in defendant's home until 2021. The basement bedrooms had makeshift doors. The lock on the door to the man cave was broken. While watching football at E.M.'s home, M.R. usually sat on the couch and had a clear view of defendant, who sat in a chair next to the couch. E.M. often sat on defendant's lap, but M.R. never saw them sitting under a blanket. Defendant was an avid fan and would stand up, move around, and yell a lot. M.R. never saw defendant touch E.M. inappropriately.

¶ 27    M.R testified that his family often played Settlers in the living room. The game used dice and cards. Defendant was always both the "banker" and a player, so his hands were busy much of

the time. D.R. played regularly, L.R. played occasionally, and the younger children never did. E.M. "[m]aybe" sat on defendant's lap sometimes, but it would not be "stable ground to sit on" for long. M.R. identified several photographs of the living room as it appeared during these games. When defendant was playing, there was room to walk behind his chair. M.R. never saw defendant touch E.M. inappropriately during these games. M.R. was asked: "[I]f you are playing the game of Settlers, would you have been facing [defendant], looking into his direction or been able to see his hands and his lap?" M.R. answered, "Yes. To play the game you need to."

¶ 28 On cross-examination, M.R. testified that the man cave door was partially warped, so that a person could see part of the room even when it was closed. James was sometimes home during the football-watching gatherings. A typical Settlers game lasted 20 or 30 minutes. On redirect, M.R. testified that he, Melissa, and L.R had access to the man cave and that the younger children could also enter. M.R. spent a fair amount of time in his bedroom, where he could hear the younger children playing around the house.

¶ 29 L.R testified as follows. She resided in defendant's house until November 2020 and had known E.M. since birth. L.R. was 18 or 19 when the events at issue occurred. The younger children would be in and out of the living room during the football games. E.M. often sat on defendant's lap, sometimes without prompting. L.R usually sat on the couch and could see defendant and E.M. clearly. She could not recall if they were covered by a blanket when E.M. sat on the defendant's lap. She never saw defendant touch E.M. inappropriately.

¶ 30 L.R. testified that, during Settlers games, defendant was always the banker, who "had a lot of duties to do during the game." Asked whether defendant's hands were "always in motion during the game," L.R. testified, "Not always but consistently." The younger children would be in and out of the living room, sometimes under the table or on the floor. When E.M. was on defendant's

lap, she "would *** be able to sit there for a long period of time," but L.R could not recall whether E.M. ever did. L.R. could see defendant's hands during the Settlers games, and she never saw him put them under E.M.'s shirt or in her pants or otherwise touch E.M. inappropriately. L.R. identified photographs of people playing Settlers in the living room as it was laid out in 2018 and 2019. In the photographs, defendant was sitting in the same chair where L.R. recalled him sitting during the games. Asked whether anything would have obstructed her view of defendant and his lap during a game, L.R. testified, "The table. Nothing else I can think of."

¶ 31    L.R. testified that, when defendant was in the man cave by himself, it "would *** be easy" for another family member to go in and out of the room. L.R. sometimes went to the man cave to use the computer. L.R. could not recall if the door to the man cave could be locked. If E.M. and A.M. were in the basement, L.R. might be able to hear them from her room, but if they were in the man cave with the door closed, probably not.

¶ 32    On cross-examination, L.R. testified that, during the football games, it was not unusual for E.M. to sit on defendant's lap. When E.M. did so, it would not distract L.R. from watching the game.

¶ 33    D.R. testified as follows. He was 15 years old and had known E.M. for as long as he could remember. During the period at issue, he and A.R. would often play with E.M. and A.M. On the last day that he saw E.M., D.R. played Settlers with defendant and L.R. Defendant was the "banker or dealer" and was busy during the game. A.R. and A.M. were in and out of the house. E.M. was outside half the time and sitting on defendant's lap the other half. Defendant gave E.M. math problems to solve during the game. Defendant's hands were on the table most of the time. Asked whether he could see defendant's lap and E.M.'s pants from his vantage point, D.R. testified, "Mostly." During the game, D.R. never saw defendant's hands in E.M.'s pants, under the front of

her shirt, or otherwise touching her inappropriately. D.R. saw no inappropriate touching during any Settlers game.

¶ 34    D.R. testified that he could enter and leave the man cave when defendant was in there. While the football games were on at E.M.'s house, D.R. sometimes watched and sometimes went elsewhere. When E.M sat on defendant's lap, D.R. never saw him touch her inappropriately.

¶ 35    Melissa testified as follows. By 2019, she had known Cherin for about 10 years. She had known E.M. and A.M. since they were born. Melissa identified photographs of the man cave, the living room, and the kitchen as they appeared in 2018 and 2019. Anyone in the family could use the man cave. The door did not lock. L.R. and M.R. had bedrooms downstairs, but the rooms did not have doors. To walk from the kitchen through the living room and into her bedroom required about 12 steps. The door between the kitchen and the living room was generally left open, including during Settlers games. During the period at issue, E.M. and A.M. came over once or twice a month to play or be babysat. Melissa was usually home then. She never saw defendant touch E.M. inappropriately.

¶ 36    On cross-examination, Melissa testified that sometimes she was not home when Settlers was being played. On May 17, 2019, she went to a prayer meeting with Cherin but came home while family members were still seated around the game board. Cherin then took E.M. and A.M. home.

¶ 37    After hearing arguments, the trial court issued a written decision, finding defendant guilty of five counts (I, II, IV, V, and VII) and not guilty of the remaining five counts (III, VI, VIII, IX, and X). The court explained that the State's evidence established three main incidents: (1) the football game incident in E.M.'s home, to which related one count of predatory criminal sexual assault of a child (count III) and two counts of aggravated criminal sexual abuse (counts VI and

VIII); (2) the man cave incident in defendant's home, to which related one count of predatory criminal sexual assault of a child (count I) and two counts of aggravated criminal sexual abuse (counts IV and VII); and (3) the board game incident in defendant's home, to which related one count of predatory criminal sexual assault of a child (count II) and two counts of aggravated criminal sexual abuse (counts V and X). The court found that, although E.M. testified consistently with her statements to Mullarkey, the State proved defendant's guilt beyond a reasonable doubt as to only the board game and man cave incidents.

¶ 38    The court explained that, although E.M. testified that defendant touched her vagina and breasts while they watched football, the evidence showed that several people were in the room at the time, they could easily see defendant and E.M., and defendant and E.M. were not covered by a blanket. "Any person at any time would only need to turn their head to observe the abuse." Thus, the State had not proved any charges arising from this incident.

¶ 39    However, the trial court concluded that the State did prove beyond a reasonable doubt that defendant had committed the offenses based on the man cave incident. The court noted that E.M.'s testimony was corroborated by James's testimony that he discovered defendant alone with E.M. in the man cave with the door closed while the other people were elsewhere in the house.

¶ 40    Also, the State proved two of the charges (counts II and V) based on the board game incident. The court reasoned that the table would have hidden from view defendant's touching of E.M.'s vagina. The court also noted that E.M. did not testify that he touched her chest—contact that would not have been hidden. Further, E.M.'s account was corroborated by her prompt outcry to Cherin. However, count X, based on the unspecified "bump" E.M. claimed to have felt while she was on defendant's lap, was not proved beyond a reasonable doubt. The court also found

defendant not guilty of count IX, a fourth alleged instance of aggravated criminal sexual abuse, because no evidence was presented on it.

¶ 41    Defendant filed a posttrial motion, contending in part that he was not proved guilty beyond a reasonable doubt. In denying the motion, the trial court explained that it acquitted defendant of the charges based on the football game incident because the State provided no evidence that defendant's actions could have evaded notice. However, the evidence was stronger for the convictions based on the man cave incident, during which defendant and E.M. were unobserved until James opened the door and saw them together in circumstances that corroborated E.M.'s testimony. The convictions based on the board game incident were also consistent with the context: in contrast to the setting of the football game incident, the living room table obscured others' view of E.M.'s lower body (but, as noted, the court found that the State did not prove count X). Thus, the court explained, the different findings were based on the different levels of corroboration for E.M.'s testimony and statements to Mullarkey.

¶ 42    At sentencing, the trial court determined that counts IV and V were lesser included offenses of, and therefore merged into, counts I and II. Therefore, the trial court imposed sentence on only counts I, II, and VII. The court sentenced defendant to minimum prison terms of six years for each conviction of predatory criminal sexual assault of a child (counts I and II) and three years for aggravated criminal sexual abuse (count VII), all sentences to be consecutive. Defendant filed a timely appeal.

¶ 43                                    II. ANALYSIS

¶ 44                          A. Sufficiency of the Evidence

¶ 45    On appeal, defendant contends first that the evidence did not prove him guilty beyond a reasonable doubt of any of the charges he was convicted of. Defendant argues that the evidence

the trial court relied on—primarily, E.M.'s testimony and out-of-court statements to Mullarkey—was so inherently implausible that the court could not reasonably find that he committed the acts. Principally, defendant argues that, had he committed the offenses, his actions could not have escaped the notice of everyone present at the time. The State responds that defendant essentially asks us to retry him and that the evidence was stronger than he portrays it.

¶ 46   In considering the sufficiency of the evidence, we ask only whether, after viewing the evidence in the light most favorable to the prosecution, any reasonable fact finder could have found the essential elements of the charged offense beyond a reasonable doubt. *People v. Hopkins*, 201 Ill. 2d 26, 40 (2002). The credibility of the witnesses and the weight to assign the evidence are within the prerogative of the fact finder. *People v. Holmes*, 141 Ill. 2d 204, 242 (1990). We must allow all reasonable inferences from the evidence in favor of the prosecution. *People v. Baskerville*, 2012 IL 111056, ¶ 31.

¶ 47   Defendant concedes much. He does not directly attack E.M.'s credibility. He grants that her testimony was generally clear and consistent. Further, he suggests no motive for her to testify falsely or selectively. We agree with the State that E.M. was consistent in her testimony and out-of-court statements, both to Mullarkey about all of defendant's acts and to her mother very shortly after the board game incident. Further, the evidence allowed a strong inference that E.M. would not have made such serious allegations against defendant unless she knew they were true. Their families had had a close and harmonious relationship before the events at issue. E.M. and defendant's daughter A.R. had been dear friends for several years, and E.M. had long been fond of defendant, often sitting on his lap without prompting.

¶ 48    Defendant nonetheless contends that other facts were so compelling as to require a reasonable doubt of his guilt. We now examine the board game and man cave incidents to evaluate the specifics of defendant's arguments.

¶ 49    On the board game incident, defendant argues essentially that (1) he could not have been so daring as to commit criminal acts around so many others who would have noticed his acts and (2) because he was playing the board game, acting as the dealer, and giving E.M. math problems, he had no opportunity to use his hands as E.M. described. We find neither argument compelling.

¶ 50    On (1), there was evidence from which the trial court reasonably found that the table obscured the others' view of defendant's hands and E.M.'s lap, such that defendant was not so reckless after all. E.M., who was (literally) in a position to know, testified that the table obscured the others' view of her lap. L.R. implicitly conceded that the table obscured her view of defendant's lap and E.M.'s lower body, and D.R. testified that he could "[m]ostly" see these areas. M.R. testified that he would have been able to see defendant's hands and lap while playing the game. To the extent this testimony contradicted E.M., the court could credit her accounts over the others. The court could also examine the table photographs and infer that defendant could conceal the movement of his hands near E.M.'s lower body. Although defendant claims that the table was not high enough to hide most of E.M.'s body, he provides no support for this assertion, and the record does not disclose E.M.'s height at the time.

¶ 51    On (2), defendant likewise cites insufficient evidence to compel a reasonable doubt. Both L.R. and D.R. testified that defendant's hands were busy during the game, but their testimony, even if credited, was not inconsistent with E.M.'s. Neither defense witness testified that defendant's hands were *always* in use above the table, but only that he used his hands

"consistently" (in L.R.'s description). The trial court could reasonably infer that there were pauses sufficient to allow defendant to move one hand out of view to touch E.M.'s private area.

¶ 52    In sum, viewing the evidence in the light most favorable to the prosecution, we conclude that defendant was proved guilty beyond a reasonable doubt of predatory criminal sexual assault of a child and aggravated criminal sexual abuse in the board game incident. E.M.'s clear and consistent statements, her lack of a motive to falsify, and the corroboration by her prompt complaint to her mother far outweighed any countervailing evidence.

¶ 53    We turn to the man cave incident. Defendant raises essentially two challenges: (1) the alleged act took place inside a room that was only a few feet from the older children's bedrooms and was accessible to anyone in the home, and (2) when James discovered defendant and E.M. in the man cave, neither of them showed any sign that defendant had engaged in improprieties with E.M.

¶ 54    Again, defendant argues that the trial court was obligated to discredit the straightforward and consistent statements of a complaining witness who had no bias or motive to testify falsely. Further, to the extent that defendant relies on circumstantial evidence, the circumstances largely corroborated E.M.'s testimony.

¶ 55    The setting of the incident actually helped the trial court to infer that defendant's actions were neither reckless nor easy to discover. The court heard evidence that defendant went to the kitchen, where the younger children were gathered, and specifically requested that E.M. accompany him downstairs to the man cave. That conduct allowed a fair inference that defendant had an improper purpose in mind and that what he intended was something to keep hidden. Further, there was evidence not only that the smaller children were outside playing at the time (perhaps at defendant's suggestion) but also that L.R. was not home. There was no evidence that M.R. was

home, much less that he was in his bedroom. Moreover, M.R. testified that, with the door to the man cave closed (albeit imperfectly because of a warped door), he would be unable to hear what went on there. And, since E.M. was hesitant to complain to anyone about defendant's conduct, there was likely not much to be heard anyway.

¶ 56　Defendant's second subargument is also unavailing. The trial court could reason that defendant had either completed his offense before James arrived or heard someone coming and withdrew his hands from their incriminating position. There was also evidence that he had practiced this type of abuse (E.M. stated that he had done it on previous occasions) and would not panic at the thought of being discovered.

¶ 57　We hold that defendant was proved guilty beyond a reasonable doubt of all three offenses.

¶ 58　　　　　　　　　　B. Proportionate Penalties Claim

¶ 59　Defendant's second claim of error is that his two Class X sentences for predatory criminal sexual assault of a child (counts I and II) violate the proportionate penalties clause, which states, "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. Defendant argues that, as charged, the two offenses contained the identical elements as the lesser-included Class 2 offenses of which he was also found guilty (counts IV and V, charging aggravated criminal sexual abuse). He concludes that this arbitrary disparity requires resentencing based on the Class 2 range. We disagree.

¶ 60　Recently, in *People v. Johanson*, 2024 IL 129425, our supreme court decided this precise issue. The defendant in *Johanson* argued that predatory criminal sexual assault of a child and aggravated criminal sexual abuse had identical elements because his acts, as charged, satisfied the

elements of both offenses. *Id.* ¶ 15. The court interpreted defendant's argument as an as-applied challenge but explained that such a challenge is not appropriate under the identical elements test:

> "The identical elements test compares the elements of two offenses to determine if the offenses are the same. [Citation.] This objective test does not consider the offenses as applied to an individual defendant. [Citation.] Rather, the question of whether the elements of one offense are the same as those of another offense turns on that statutory language, not the facts alleged in a particular case. *** That defendant's acts in this case constituted both offenses shows only that aggravated criminal sexual abuse may be a lesser included offense of predatory criminal sexual assault of a child in some cases, but that does not make the elements identical." *Id.* ¶ 16.

The court then determined that the two offenses did not have identical elements, because, unlike predatory criminal sexual assault of a child, a person can commit aggravated criminal sexual abuse without touching the victim's sex organ or anus. *Id.* ¶¶ 14, 17. Based on *Johanson*, we reject defendant's proportionate penalties claim.

¶ 61                               III. CONCLUSION

¶ 62    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 63    Affirmed.